UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

SHAWN STEWART

                              Plaintiff,                          Docket No.: 22-CV-3583
                                                                              (JSR)

              -against-

POLICE OFFICER STEPHANIE DAVIS, SHIELD # 28218,
POLICE OFFICER BRIAN HIRSCHMAN, SHIELD # 22623,

                              Defendants/Third Party-Plaintiffs,

THE CITY OF NEW YORK,

                              Third-Party Defendants.

------------------------------------------------------------------------ x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT NEW YORK CITY POLICE OFFICER STEPHANIE DAVIS AND BRIAN HIRSCHMAN'S MOTION FOR A JUDGMENT AS A MATTER OF LAW, PURSUANT TO RULE 50 OF THE FEDERAL RULES OF CIVIL PROCEDURE, GRANTING THEM QUALIFIED IMMUNITY.

*Doug LaBarbera, Esq*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES  ............................................................................. ii

PRELIMINARY STATEMENT  ...................................................................... 1

SUMMARY OF THE EVIDENCE  .................................................................. 1

STANDARD OF REVIEW  ............................................................................ 10

ARGUMENT  ................................................................................................. 11

POINT I.

OFFICERS OF REASONABLE COMPETENCE COULD
DISAGREE AS TO WHETHER THERE WAS REASONABLE
SUSPICION TO SEIZE PLAINTIFF, ENTITLING THE OFFICERS
TO QUALIFIED IMMUNITY.  ................................................................. 11

POINT II.

OFFICERS OF REASONABLE COMPETENCE COULD
DISAGREE AS TO WHETHER PLAINTIFF'S DETENTION WAS
SUFFICIENTLY LIMITED IN DURATION,
ENTITLING THE OFFICERS TO QUALIFIED IMMUNITY.  ............................... 17

CONCLUSION  ............................................................................................. 19

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

Brosseau v. Haugen,
   543 U.S. 194 (2004). ................................................................. 13

Castro v. United States,
   34 F.3d 106 (2d Cir. 1994). ...................................................... 13

Coollick v. Hughes,
   699 F.3d 211 (2d Cir. 2012). ..................................................... 13

Doninger v. Niehoff,
   642 F.3d 334 (2d Cir. 2011). ..................................................... 13

Florida v. Bostick,
   501 U.S. 429 (1991). ................................................................. 12

Gil v. County of Suffolk,
   590 F.Supp.2d 360 (E.D.N.Y. 2008). ...................................... 13

Grice v. McVeigh,
   873 F.3d 162 (2d Cir. 2017). ..................................................... 11

Harlow v. Fitzgerald,
   457 U.S. 800 (1982). ................................................................. 12

Hathaway v. Coughlin,
   37 F.3d 63 (2d Cir. 1994). ........................................................ 12

Ikezi v. City of New York,
   No. 14-CV-5905 (MKB), 2017 WL 1233841
   (E.D.N.Y. Mar. 31, 2017). ........................................................ 17

Illinois v. Wardlow,
   528 U.S. 119 (2000). ...................................................... 12, 14, 15

Jackson v. Sauls,
   206 F.3d 1156 (11th Cir. 2000). ............................................... 13

Jacobson v. Town of North Haven,
   No. 04–CV–1084 (WWE), 2006 U.S. Dist. LEXIS 73372
   (D.Conn. Aug. 18, 2006). ......................................................... 13

Jones v. Treubig,
   963 F.3d 214 (2d Cir. 2020). ..................................................... 10

Muehler v. Mena,
   544 U.S. 93 (2005). ............................................................ 15, 16

Muschette on Behalf of A.M. v. Gionfriddo,
    910 F.3d 65 (2d Cir. 2018). ......................................................... 12, 13

Sampson v. City of Schenectady,
    160 F.Supp.2d 336 (N.D.N.Y. 2001). ......................................... 17

Scott v. Harris,
    550 U.S. 372 (2007). ..................................................................... 10

Sibron v. New York,
    392 U.S. 40 (1967). ...................................................................... 14

Sutton v. Duguid,
    No. 05-CV-1215 (JFB)(JMA), 2007 WL 1456222
    (E.D.N.Y. May 16, 2007). ............................................................ 13

Terry v. Ohio,
    392 U.S. 1 (1968). ................................................................. *passim*

United States v. Bailey,
    743 F.3d 322 (2d Cir. 2014). ................................................. 11, 17

United States v. Bayless,
    201 F.3d 116 (2d Cir. 2000). ...................................................... 12

United States v. Campbell,
    No. 06–CR–6025L, 2006 WL 3151032
    (W.D.N.Y. Nov.1, 2006). ............................................................. 14

United States v. Ceballos,
    719 F.Supp. 119 (E.D.N.Y.1989). ............................................... 14

United States v. Compton,
    830 F.3d 55 (2d Cir. 2016). ......................................................... 11

United States v. Cortez,
    449 U.S. 411 (1981). .................................................................... 12

United States v. Sharpe,
    470 U.S. 675 (1985). ............................................................. 14, 17

United States v. Tehrani,
    49 F.3d 54 (2d Cir. 1995). ........................................................... 17

**Statutes**                                                            **Pages**

42 U.S.C. § 1983 .............................................................................. 1

Fed. R. Civ. P. 50 ................................................................. 1, 10, 19

## PRELIMINARY STATEMENT

Plaintiff Shawn Stewart ("Plaintiff") brought this action, pursuant to 42 U.S.C. § 1983, against Defendant New York City Police Officers Stephanie Davis and Brian Hirschman ("Officers Davis and Hirschman" or "the Officers"), alleging violations of his right to be free from an unlawful search and seizure and excessive force.

Trial of Plaintiff's two claims commenced on April 8th, 2024.  At the close of all the evidence, Officers Davis and Hirschman moved for a judgment as a matter of law, pursuant to Rule 50 of the Federal Rules of Civil Procedure, for judgment as a matter of law and Qualified Immunity as a matter of law on each of Plaintiff's claims.  (Declaration of Douglas LaBarbera "LaBarbera Decl." Exhibit A- Trial Transcript "TT" at 294:13 to 298:7)  The Court reserved judgment on the Officers' motion as it related to Qualified Immunity and submitted the case to the jury. (Id.)  The jury found the Officers not liable for excessive force, but liable for committing an unlawful search and seizure and awarded Plaintiff $25,000 in compensatory damages.

Considering the jury's finding, the Officers now respectfully renew their motion, pursuant to Rule 50 of the Federal Rules of Civil Procedure, for a judgment as a matter of law that the Officers are entitled to Qualified Immunity.

## SUMMARY OF THE EVIDENCE

Three witnesses were called during trial, Plaintiff, Officer Davis and Officer Hirschman. Nearly the entire interaction is captured by the Officers' body worn cameras.  (LaBarbera Decl. Exhibit B & C)

Plaintiff

On direct examination, Plaintiff testified that in September of 2019 he was working for a company Rising Ground which was located at 140 Alcott Street, Bronx, New York in Co-op City.  (TT 30:21 to 31:22)  Rising Ground had an office on the 16th floor.  (TT 32:14-17)  At approximately noon on September 25th, 2019, Plaintiff left the office on the 16th floor and was intending to conduct his "regular routine check, which was to just check each floor that we have residents in." (TT 34:19-24)  He was intending to use the elevator to do his rounds. (TT 35:15-19)  When the elevator doors opened, he saw the Officers.  (TT 36:1-3)  Plaintiff's intention was to get on the elevator.  (Id. at 4-5)  The Officers asked Plaintiff a series of questions, such as "where are you coming from," and "what are you doing on the floor." (TT 36:6-11)  Plaintiff responded by asking them "what is this about." (TT 36:14-15)  The Officers asked Plaintiff again where he was coming from and asked for his identification.  (Id. at 37:25 to 38:4)  Plaintiff did not produce identification.  (TT 38:5-23)  Plaintiff agreed to be handcuffed. (Id.)  He turned around and put his hands behind his back.  (Id.)  Plaintiff consented to being handcuffed.  (TT 39:14-15)  Plaintiff was handcuffed.  (TT 39:21-25)  Plaintiff was detained in the hallway for 25-30 minutes.  (TT 40:22 to 41:1)  Additional police officers arrived including a lieutenant, and Plaintiff was released after 25 minutes.  (TT 42:3-16)

On cross-examination, Plaintiff testified that he was leaving the 16th floor when the incident began.  (TT 73:22-25)  The first thing Plaintiff told the Officers was that he was coming from an apartment.  (TT 74:7-9)  The Officers asked Plaintiff what apartment he was coming from.  (TT 76:14-25)  Plaintiff never told the Officers he was coming from Apartment 16-E. (Id.)  Instead, he asked the Officers "what is this about." (Id.)  Plaintiff never told the Officers he worked at the location.  (TT 77:1-2)  Officer Hirschman explained to Plaintiff that the

Officers were there because of a call for a dispute.  (TT 77:9-13)  He also explained to Plaintiff that people usually flee from disputes.  (Id. at 14-16)  Plaintiff never denied that he was involved in any dispute.  (Id. 17-19)  Plaintiff was asked what apartment he was coming from multiple times, but refused to answer.  (TT 79:3-10)  The Officers asked Plaintiff for identification, but he refused to provide it. (Id. 11-15)  After Plaintiff asked the Officers questions, Officer Hirschman explained to Plaintiff a second time that they were there because there was a call for a dispute on that floor.  (TT 79:24 to 80:2)  He also told Plaintiff that he wanted to make sure Plaintiff was not fleeing from the dispute. (TT 80:3-5)

Officer Davis also asked Plaintiff what apartment he was coming from, but Plaintiff refused to tell her.  (TT 81:5-7)  When asked again, Plaintiff refused to answer and instead asked whether he "fit the description."  (Id. at 8-13)  Officer Davis asked Plaintiff "do you want us to handcuff you."  (Id. 14-16)  Plaintiff stated, "sure go ahead." (Id. at 14-24)  Then, Plaintiff turned his body around and put his hands behind his back.  (TT 81:25-82:2)  Plaintiff then consented to being handcuffed.  (TT 82:3-7)  As Plaintiff was being handcuffed, Officer Davis explained to Plaintiff that they were trying to make sure everyone was safe on the floor. (TT 82:23 to 83:3)  After Plaintiff was handcuffed, the Officers gave Plaintiff opportunities to explain what he was doing at the location.  (TT: 83:23 to 84:1)  After Plaintiff was handcuffed, the Officers again told Plaintiff they were there for a dispute and explained why he was being detained.  (TT 84:5-12)  Plaintiff lied to the Officers about what he was doing when they first encountered him.  (TT 86:7 to 87:25)  Plaintiff told the Officers he was on his way to get his medication when they stopped him. (Id.)  The medication Plaintiff was referring to was Advil or Tylenol.  (Id.) The medication was in his bag in the office in Apartment 16-E on the 16th floor where the officers encountered Plaintiff.  (Id.)  Plaintiff was not on his way to the office when he

encountered the Officers; he was on his way to leave the 16th floor in the elevator.  (Id.)

Approximately twenty-three minutes into the incident, lieutenant Cruz arrived.  (TT 106:6-16)

lieutenant Cruz asked Plaintiff if he lived in the building and Plaintiff told her he worked there.

(Id. at 12-16)  That was the first time Plaintiff told any police officer that he was in the building

because he worked there.  (Id. at 17-22)  She also asked Plaintiff if anyone called 911 and

Plaintiff responded, "why would I know if it's not related to me."  (TT 107:16-24)

Officer Davis

Officer Davis testified on direct examination that on September 25th, 2019, at

approximately 11:40 AM she was driving in her sector when a 911 call came over the radio.  (TT

119:20 to 120:3)  Officer Davis heard the dispatcher state that the call was for a "52 family

assault" and that a sister was calling on behalf of her sister and the father of her child." (TT

120:4-7)  The NYPD vehicle the Officers were driving in had a tablet in the car that could have

provided more information about the 911 call, but it was not working properly.  (TT 121:8-17)

The Officers were not able to find out any additional information about the call.  (Id.)  After she

received the 911 call, Officer Davis drove to 140 Alcott Place.  (Id. at 21-23)  That was not the

location that the 911 dispatcher provided. (TT 121:24 to 122:13)  Officer Davis testified that they

responded to the wrong building because 140 Alcott was the building in Co-op City that they

responded to daily, so when she heard the number "140" she assumed the call was for 140 Alcott

place and drove there.  (Id.)  The Officers did not realize they were in the wrong building until

after the entire incident was over. (Id.)  After the Officers arrived at the building they walked

through the hallway and went up to the 16th floor in an elevator.  (TT 122:14-16)  When the

elevator doors opened the Officers saw Plaintiff standing right by the elevator.  (TT 122:22 to

123:25)  Officer Davis testified that it was significant to her that Plaintiff was standing by the

elevator because people involved in disputes sometimes leave quickly and the officers end up passing the individuals involved.  (Id.)  Plaintiff told the Officers he was coming from an apartment.  (Id.)  Officer Davis testified that it was significant to her that Plaintiff said he was coming from an apartment because it raised her awareness that Plaintiff could be involved in the dispute they were there to address, and she wanted to confirm if it was the same apartment.  (Id.) Officer Davis activated her body worn camera once Plaintiff started becoming evasive.  (TT 124:1-9)  Plaintiff refused to answer the Officers' questions.  (TT 125:1-9)  Officer Davis kept asking what apartment he was coming from, and Plaintiff responded, "why am I being stopped." (Id. at 5-9)  Officer Davis became suspicious that Plaintiff was involved in the dispute because he was being evasive and refusing to answer questions.  (TT 127:5-15)  After Plaintiff was placed in handcuffs, Officer Davis asked him again what apartment he was coming from.  (Id. at 127:18-23)  Officer Davis retrieved Plaintiff's identification to see if he lived in the building. (TT 128:1-10)  The address on Plaintiff's identification was not in Co-op City.  (Id. 13-20) Officer Davis made a radio transmission trying to raise the central radio system ("Central") to request assistance but initially got no response.  (TT 129:1-18)  Officer Davis eventually got through to Central and requested a lieutenant respond to the location.  (TT 131:7-21)  The dispatcher asked Officer Davis if her request was for the family dispute job they were asked to address, and Officer Davis responded that she was not sure.  (Id.)  The dispatcher asked Officer Davis if her location was 140 Asch Loop and she said it was.[1]  The dispatcher tried to raise a lieutenant over the radio but received no response.  (TT 132:13-16)  Plaintiff asked Officer Davis if he committed a crime, and she responded by asking him a question, "did you," and Plaintiff said "yes."  (TT 133:18 to 134:17)  Officer Davis did not expect him to say yes, so she

---

[1] As mentioned previously, the Officers did not learn that they had responded to 140 Alcott Place rather than 140 Asch Loop until after the incident was over.

responded, "we don't know that." (Id.)  This exchanged confused Officer Davis because Plaintiff "said he did commit a crime and he was coming from an apartment, and he just kept being evasive."  (Id.)  Plaintiff asked the Officers "can you knock on my apartment door to get my medication."  (TT 136:4-19)  This question by Plaintiff led Officer Davis to believe that Plaintiff lived there.  (Id.)  Plaintiff told the Officers he was on his way to get his medication when they stopped him.  (TT 137:22 to 138:11)  Officer Davis considered this a lie because when she encountered Plaintiff he was trying to get on the elevator.  (Id.)  This caused Officer Davis to believe they needed to investigate further. (Id.)

A second unit, Officers Sugrim and Vargas arrived at the location.  (TT 138:24 to 139:24)  Officer Hirschman explained to them that they had responded to a domestic dispute and encountered Plaintiff who refused to help them, so they needed assistance.  (TT 139:22 to 140)  At that point, Officers Davis and Hirschman were responsible for watching Plaintiff while Officers Sugrim and Vargas conducted a search for the complainant, the person who called 911.  (TT 140:11-14)  Officers Sugrim and Vargas began knocking on apartment doors.  (TT 143:13-17)  Two individuals came out into the hallway and Officer Hirschman told them that they were waiting for a supervisor.  (TT 144:2-25)  Officer Davis received a call on her personal cell phone from lieutenant Cruz who wanted to know why she was requested to respond.  (TT 145:10-15)  Officer Davis explained the situation to lieutenant Cruz and told her that Plaintiff "doesn't seem to be part of the dispute." (Id. at 20-22)  Officer Davis made that statement because she recognized one of the individuals who came into the hallway as someone who worked in the group home in the building, and it seemed like he knew the Plaintiff.  (TT 145:23 to 146:21)  Officer Davis was still not sure whether Plaintiff was involved in the dispute.  (Id.)  Lieutenant Cruz asked Officer Davis if she spoke to the complainant, and Officer Davis advised her that

they had not "gotten that far yet."  (TT 150:15-24)  Officer Davis told lieutenant Cruz that they

were located at 140 Asch Loop because she believed that is where they were located.  (TT

151:10-18)  Lieutenant Cruz advised Officer Davis she was going to respond to the location.  (Id.

at 21-25)  As per protocol, the Officers were waiting for the lieutenant to arrive before making

any decisions regarding Plaintiff.  (TT 154: 10-14)  A white male came out into the hallway and

stated that Plaintiff was an employee of theirs.  (Id. 154:3-9)  Officers Sugrim and Vargas were

still trying to locate the complainant.  (Id. at 10-19)  They told the group of individuals in the

hallway that they were there for an investigation.  (Id. at 22-24)

Lieutenant Cruz arrived at the location. (TT 156:19-23)  She arrived approximately

twenty-three minutes after the Officers first encountered Plaintiff and twenty minutes after

Officer Davis requested that she respond.  (TT 156:24 to 157:11)  Lieutenant Cruz asked Officer

Davis if they found the complainant, and she stated that Officers Sugrim and Vargas were still

looking.  (TT 157:16-22)  Lieutenant Cruz asked Plaintiff if he lived in the building, and he

stated that he worked there and denied that he lived there.  (TT 158:1-8)

Officer Hirschman

Officer Hirschman testified on direct examination that on September 25th, 2019, at

approximately 11:40 AM he and Officer Davis received a call for a domestic dispute over

Central.  (TT 234: 4-9)  The information provided on the call was that the dispute was a possible

assault involving a male at 140 Asch Loop in Apartment 16-G.  (Id. at 12-23)  The 911

dispatcher did not provide a description of the person who had allegedly committed the assault.

(TT 235: 1-4)  Officer Hirschman had a tablet in his car which ordinarily would have allowed

him to retrieve more information about the call, but it was not working properly at the time.  (Id.

at 14-18)

Officers Hirschman and Davis drove to 140 Alcott, as opposed to 140 Asch Loop, to respond to the call.  (TT 236-237: 25-7)  Officer Hirschman testified that the apartment complex has alphabetical lettering (e.g. A, B, C) designated for each street, so differentiating between the "A" streets could be confusing.  (TT 237: 8-12)  Once the Officers arrived at the location, they attempted to reload the tablet once more, but it was still not working properly.  (TT 237: 14-18)  The Officers entered the building and took the elevator to the 16th floor.  (Id. at 23-25)  While they were approaching the 16th floor, Officer Hirschman was on alert as trained given the potential for emotional instability and violence on these types of calls.  (TT 238: 3-6)  Officer Hirschman activated his body camera while in the elevator.  (TT 238: 11-13).

When the elevator doors opened, Officer Hirschman could see Plaintiff standing there like he was going to get into the elevator.  (TT 239:3-5)  Plaintiff seemed to have an angry face when Officer Hirschman first saw him. (TT 266:14-24)  Officer Hirschman testified that Plaintiff's face looked angry right when the body camera footage began. (TT 268:1-6)  As he was responding to a domestic abuse call, Officer Hirschman wanted to find out which apartment Plaintiff was coming from to know if he was involved.  (TT 240: 9-11)  Officer Hirschman asked Plaintiff for his ID.  (Id. at 2-7)  He was concerned Plaintiff was fleeing the dispute they were asked to address.  (Id. at 8-20)  Officer Hirschman told Plaintiff multiple times that they were there to address a dispute.  (TT 240:23 to 241:10)  Plaintiff was handcuffed because he decided to turn around and put his hands behind his back, and because of his responses to the Officers questions.  (TT 241:18-23)  These actions caused Officer Hirschman to strongly consider that Plaintiff was part of the dispute.  (Id.)   After Plaintiff was handcuffed, Officer Hirschman continued to ask Plaintiff what apartment he was coming from to try to rule him out as a suspect.  (TT 242:4-11)  Even after Plaintiff was handcuffed, Officer Hirschman still suspected Plaintiff

was part of the domestic dispute because Plaintiff was acting erratically and, in his experience, people involved in domestic incidents act strange.  (TT 246:24 to 247:6)

Officer Sugrim and Vargas arrived at the location.  (TT 252:2-4)  Officer Hirschman explained to them that they were there because of a call for a domestic dispute on the floor. (Id. at 5-6)  Officer Hirschman told them that Plaintiff was trying to get on the elevator.  (Id. at 9-12) Officer Hirschman told them Plaintiff would not provide his pedigree or tell them what apartment he was coming from. (Id. at 15-18)  Officer Hirschman explained that he and Officer Davis thought Plaintiff might be part of the dispute. (Id. at 20-22)  Officers Sugrim and Vargas took over the investigation of the domestic dispute when they got there, and Officers Hirschman and Davis were responsible for safeguarding Plaintiff.  (TT 253:6-10)  Some people came into the hallway, and Officer Hirschman told them there was an investigation going on and that a supervisor was going to respond.  (TT 254:11 to 255:10)  Officer Hirschman had expected a supervisor to respond to the 911 call shortly after it came over the radio.  (TT 255:17 to 256:15) Officer Hirschman saw Officers Sugrim and Vargas conducting their investigation by talking to the individuals who came out into the hallway.  (TT 260:2-8)  Even though one of the individuals stated that Plaintiff was "an employee of ours," Officer Hirschman did not feel comfortable releasing Plaintiff because of his behavior and the answers he gave to the Officers' questions. (TT 260:9-19)   As a result of Plaintiff's odd behavior, Officer Hirschman wanted Officer Sugrim to finalize her investigation so he knew that Plaintiff was absolutely not involved and could be ruled out as a suspect. (Id.)  Lieutenant Cruz arrived at the location of the incident and Officer Hirschman explained that they were responding to a call for a domestic dispute on that floor. (TT 261:10 to 262:1)  Officer Hirschman told lieutenant Cruz that when the Officers exited the elevator Plaintiff was trying to leave the floor.  (TT 262:4-7)  Officer Hirschman also told

9

lieutenant Cruz that the Officers asked for Plaintiff's pedigree so they could determine if Plaintiff was coming from the apartment they were responding to. (Id. at 9-11)  Lieutenant Cruz was trying to ascertain how far along the Officers were in their investigation. (Id. at 16-21) Lieutenant Cruz asked Plaintiff if he lived in the building, and he responded that he worked there.  (TT 264:4-9)  Plaintiff never told the Officers he worked in the building.  (Id. at 10-15) Lieutenant Cruz also asked Plaintiff if anyone called 911, and Plaintiff responded that he did not know because he wa not involved in any incident.  (TT 264:24 to 265:3)

## <u>STANDARD OF REVIEW</u>

Pursuant to Rule 50(a), a judgment as a matter of law is appropriate when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1).  "[I]n the context of a Rule 50(a) motion, [the court] must consider the evidence in the light most favorable to the party against whom the motion was made and ... give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." <u>Jones v. Treubig</u>, 963 F.3d 214, 224 (2d Cir. 2020).  "There is, however, an added wrinkle in this case: existence in the record of a videotape capturing the events in question." <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007), (*holding* the Court of Appeals should have viewed the facts in the light depicted by the video tape when the plaintiff's version of events was "so utterly discredited by the record that no reasonable jury could have believed him").

## ARGUMENT

## POINT I.

## OFFICERS OF REASONABLE COMPETENCE COULD DISAGREE AS TO WHETHER THERE WAS REASONABLE SUSPICION TO SEIZE PLAINTIFF, ENTITLING THE OFFICERS TO QUALIFIED IMMUNITY.

Even when construing the facts in a light most favorable to Plaintiff, his actions, together with the information the Officers learned from the 911 dispatcher, made it reasonable for the Officers to believe, even if they were mistaken, that it was lawful to seize Plaintiff for the purpose of investigation.

**Reasonable Suspicion**

"Under the Fourth Amendment, an officer may conduct a brief investigatory detention (commonly known as a "*Terry* stop") as long as the officer has reasonable suspicion that the person to be detained is committing or has committed a criminal offense."  United States v. Compton, 830 F.3d 55, 61 (2d Cir. 2016) (*quoting* Terry v. Ohio, 392 U.S. 1, 30 (1968)).  "The standard for reasonable suspicion is not high, and is less than what probable cause requires." Grice v. McVeigh, 873 F.3d 162, 167 (2d Cir. 2017) (*citing* United States v. Bailey, 743 F.3d 322, 332 (2d Cir. 2014)).  "Reasonable suspicion requires more than an inarticulate hunch." Compton, 830 F.3d at 61 (*citing* Terry, 392 U.S. at 22).  "The suspicion must derive from specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting wrongdoing." Compton, 830 F.3d at 61 (*citing* Bailey, 743 F.3d at 332).  "In assessing the reasonableness of an officer's suspicion, we must take into account the totality of the circumstances and must evaluate those circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training."  Compton, 830 F.3d at 61–62 (*citing* United States v.

Bayless, 201 F.3d 116, 133 (2d Cir. 2000)), *see also* United States v. Cortez, 449 U.S. 411, 418 (1981) ("[T]he evidence ... collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.").  "In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences from suspicious behavior, and this Court cannot reasonably demand scientific certainty when none exists." Illinois v. Wardlow, 528 U.S. 119, 119 (2000).  "Thus, the reasonable suspicion determination must be based on commonsense judgments and inferences about human behavior." Id.  The Supreme Court has "held repeatedly that mere police questioning does not constitute a seizure." Florida v. Bostick, 501 U.S. 429, 434 (1991).  "*Terry* recognized that officers can detain individuals to resolve ambiguities in their conduct, … and thus accepts the risk that officers may stop innocent people." Wardlow, 528 U.S. at 120 (*citing* Terry, 392 U.S. at 30).

### Qualified Immunity

Qualified immunity "shields public officials from liability for their discretionary acts that do 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir. 1994) (*quoting* Harlow v. Fitzgerald, 457 U.S. 800 (1982)).  "That is, if reasonably competent officers could differ, qualified immunity is appropriate." Id.  Put another way, "[a]n officer is entitled to qualified immunity if any reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, could have determined that the challenged action was lawful." Muschette on Behalf of A.M. v. Gionfriddo, 910 F.3d 65, 70 (2d Cir. 2018).  "[O]ur inquiry [on qualified immunity] is not whether the officer should have acted as he did." Id.  "Nor is it whether a singular, hypothetical entity exemplifying the 'reasonable officer' . . . would have acted in the

same way." Id.  "[T]he Supreme Court has observed that qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." Doninger v. Niehoff, 642 F.3d 334, 353 (2d Cir. 2011).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Brosseau v. Haugen, 543 U.S. 194, 200 (2004). "Officials are entitled to qualified immunity [when] their decision was reasonable, even if mistaken." Castro v. United States, 34 F.3d 106, 112 (2d Cir. 1994).  "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Coollick v. Hughes, 699 F.3d 211, 221 (2d. Cir. 2012).

"[T]o determine whether an officer is entitled to qualified immunity on an investigatory stop, the Court must examine whether (a) it was objectively reasonable for the officers to believe reasonable suspicion existed or (b) officers of reasonable competence could disagree on whether the reasonable suspicion test was met." Sutton v. Duguid, No. 05-CV-1215 (JFB)(JMA), 2007 WL 1456222, at *6 (E.D.N.Y. May 16, 2007) (citing Jackson v. Sauls, 206 F.3d 1156, 1166 (11th Cir. 2000) ("When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop.")) see also, Jacobson v. Town of North Haven, No. 04–CV– 1084 (WWE), 2006 U.S. Dist. LEXIS 73372, at *17 (D.Conn. Aug. 18, 2006) (granting summary judgment on the basis of qualified immunity where there was "arguable reasonable suspicion" that some criminal activity was occurring) see also Gil v. County of Suffolk, 590 F.Supp.2d 360, 370 (E.D.N.Y. 2008) (granting qualified immunity because there was "no genuine issue of material fact as to whether arguable reasonable suspicion existed for the initial stop and detention to support qualified immunity").

The undisputed facts and the video footage clearly demonstrate that there was arguable reasonable suspicion to detain Plaintiff.  When the Officers were responding to the 911 call, they knew they were addressing a dispute that happened in a specific apartment, 16-G, on the 16th floor.  They also knew they were looking for a male perpetrator.  When they arrived at the 16th floor, they observed Plaintiff, a male, attempting to get on the elevator to leave the location.  The Officers reasonably believed Plaintiff might be fleeing from the location of the dispute.  The Supreme Court has recognized that in the context of a *Terry* stop "[o]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."  Wardlow, 528 U.S. at 119.  Courts in this Circuit have also recognized that the flight of a suspect is a factor that can give rise to reasonable suspicion.  *see*, United States v. Sharpe, 470 U.S. 675, (1985) ("Perhaps none of these facts, standing alone, would give rise to a reasonable suspicion; but taken together as appraised by an experienced law enforcement officer, they provided clear justification" for an investigatory stop); Sibron v. New York, 392 U.S. 40, 66 (1967) ("[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea* ..."); United States v. Ceballos, 719 F.Supp. 119, 125 (E.D.N.Y.1989) ("The defendants' flight in this case was the crest of a rising wave of suspicion. It justified the agents' decision to chase defendants and detain them for questioning."); United States v. Campbell, No. 06–CR–6025L, 2006 WL 3151032, at *2 (W.D.N.Y. Nov. 1, 2006) (*holding* that where the suspect fled, unprovoked, from officers and attempted to remove a metallic object from his pocket "it was entirely reasonable for [the officer] to follow [the suspect] into the foyer to apprehend him").  The Officers' suspicion was evident as they immediately explained to Plaintiff that one of the reasons why they were asking him

questions was that they were concerned because people usually flee from the types of disputes they were called to address.

The Officers' concern that Plaintiff might be fleeing caused them to ask Plaintiff where he was coming from. "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual" and "ask to examine the individual's identification." Muehler v. Mena, 544 U.S. 93, 101 (2005). Plaintiff did not initially refuse to answer questions. He admitted on cross-examination that the first thing he told the Officers was that he was coming from an apartment. Given the Officers knew from the 911 call that the dispute they were addressing happened in an apartment, Plaintiff's response that he was coming from an apartment heightened their suspicion. The Officers asked Plaintiff what apartment he was coming from multiple times, but Plaintiff persistently refused to answer. Not only did he refuse to answer questions, but Plaintiff also demanded to be told details about what the Officers were investigating. Plaintiff asked the Officers whether he fit the description of a suspect. "Nervous, evasive behavior is another pertinent factor in determining reasonable suspicion." Wardlow, 528 U.S. at 119. The Officers had enough information at that time to form a reasonable belief that Plaintiff was testing them and was trying to evade their investigation as to whether he was involved in the dispute. The Officers were explicit in that they were trying to determine whether Plaintiff was fleeing from a dispute. In response, Plaintiff never denied his involvement or knowledge of any incident. He also never expressed that he had a constitutional right not to answer questions. Rather, when Officer Davis asked him, "do you really want us to handcuff you," Plaintiff consented by responding "sure go ahead," turning around, and putting his hands behind his back. (TT 81:5 to 82:2) Plaintiff failed to provide even the most basic information after he stated he was coming from an apartment, which made it reasonable for the

Officers to believe he was acting in a manner inconsistent with innocence.  Considering these facts, which are not in dispute, at a minimum, officers of reasonable competence could disagree as to whether there was reasonable suspicion to detain Plaintiff to investigate.  As such, there was arguable reasonable suspicion to seize Plaintiff entitling the Officers to Qualified Immunity.

Plaintiff's words and actions in response to Officer Davis' question "do you want us to handcuff you," provide a separate basis for Qualified Immunity.  Plainly, Plaintiff provided consent to be seized.  He testified as such on direct examination. (TT 39:14-15)  The law is clear that in the context of a *Terry* stop "even when officers have no basis for suspecting a particular individual, they may … request consent to search his or her luggage." Muehler v. Mena, 544 U.S. 93, 101 (2005).  But, upon information and belief, no Court has made a dispositive ruling on the issue of consent when it relates directly to a seizure.  It is respectfully submitted that it was not clearly established as of the date of the incident that it was unlawful for an officer to seize a suspect during a *Terry* stop when the suspect provided consent to be seized.  Put another way, it was not clear to a reasonable officer in Officer Davis and Hirschman's position that it would have been unlawful to seize Plaintiff when he stated, "sure go ahead," in response to being asked whether he wanted to be handcuffed.  Upon information and belief, there is no Second Circuit precedent which would suggest that that it would be clear to a reasonable police officer that such conduct is a violation of the law.  As such, the Officers are entitled to Qualified Immunity.

## POINT II.

## OFFICERS OF REASONABLE COMPETENCE COULD DISAGREE AS TO WHETHER THE LENGTH OF PLAINTIFF'S DETENTION WAS SUFFICIENTLY LIMITED IN DURATION, ENTITLING THE OFFICERS TO QUALIFIED IMMUNITY.

Even when construing the facts in a light most favorable to Plaintiff, it was reasonable for the Officers to believe, even if they were mistaken, that Plaintiff's detention was sufficiently limited in duration.

"Terry Stops, because they are investigative in nature, must be brief and reasonably related in scope to the circumstances which justified the intervention in the first place." Sampson v. City of Schenectady, 160 F. Supp. 2d 336, 344 (N.D.N.Y. 2001) (*citing* Terry, 392 U.S. at 20). "[T]here is no outside time limitation for a permissible *Terry* stop." United States v. Tehrani, 49 F.3d 54, 61 (2d Cir. 1995). The Second Circuit has declined "to hold that a thirty minute detention based on reasonable suspicion is, *per se,* too long." Tehrani, 49 F.3d at 61. The Supreme Court has specifically rejected "the contention that a 20-minute stop is unreasonable when the police have acted diligently, and a suspect's actions contribute to the added delay about which he complains." Sharpe, 470 U.S. at 688. "In assessing whether a detention is too long or intrusive to be justified as an investigative stop, courts properly examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." Bailey, 743 F.3d at 336; *see also*, Ikezi v. City of New York, No. 14-CV-5905 (MKB), 2017 WL 1233841, at *9 (E.D.N.Y. Mar. 31, 2017) (*finding* a twenty-five minute detention reasonable). "A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." Sharpe, 470 U.S. at 686. "A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by

17

which the objectives of the police might have been accomplished."  Id. at 686-87.  "But the fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, itself, render the search unreasonable."  Id. at 687.  "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it."  Id.

The length of Plaintiff's detention is apparent from a review in the body camera footage. (LaBarbera Decl. Ex. B)  The footage begins precisely at the moment the Officers first encounter Plaintiff.  (Id. at 0 seconds)  Plaintiff is handcuffed after one minute and twenty-eight seconds. (Id. at 1:28)  Lieutenant Cruz arrived twenty-two minutes and twenty-seven seconds after the encounter began.  (Id. at 22:27)  Plaintiff is uncuffed after approximately twenty-six minutes and ten seconds.  (Id. at 26:00)  Plaintiff was detained for approximately twenty-four minutes.  Given Plaintiff's conduct and his refusal to cooperate with the Officers' investigation, it was reasonable for the Officers to believe that it was lawful to detain Plaintiff for twenty-four minutes.

The video demonstrates that the Officers were diligent in their investigation.  As soon as they observed Plaintiff, the Officers immediately began to investigate whether he was involved based upon his comment that he was coming from an apartment.  Even after Plaintiff consented to being handcuffed, the Officers continued to try to investigate by pleading with Plaintiff to tell them what apartment he was coming from.  Plaintiff refused to cooperate.  Officer Davis tried to raise Central for assistance two minutes and thirty-seven seconds after the incident began and approximately a minute after Plaintiff was handcuffed.  (Id. at 2:37)  While the Officers were waiting for back up to arrive, they repeatedly explained to Plaintiff that he was stopped because they were trying to investigate whether he was involved in the dispute, but Plaintiff refused to answer questions, and never denied his involvement.  The second unit, Officers Sugrim and

18

Vargas arrived eleven minutes and forty-two seconds after the encounter began and started to knock on apartment doors searching for a complainant.  (Id. at 11:42)  Officers Sugrim and Vargas continued to search the 16th floor for a complainant until lieutenant Cruz arrived and ordered that Plaintiff be released.

Plaintiff hindered the Officers' investigation by refusing to cooperate and now complains of the length of his detention.  Even in the face of Plaintiff's refusal, the Officers took steps to diligently investigate by immediately calling for back up immediately and explaining the situation to responding Officers so that they could investigate.  But in the context of Qualified Immunity, the calculus is further refined.  The question is whether a reasonable police officer should have understood that it was unlawful to detain Plaintiff for twenty-six minutes in light of the facts depicted in the video.  Based upon Plaintiff's initial statement that he was coming from an apartment, his subsequent refusal to cooperate with the Officers, and his consent to being handcuffed, it is clear that officers of reasonable competence could disagree as to whether it was lawful to detain Plaintiff for twenty-six minutes for the purpose of investigating his involvement.  As such, the Officers are entitled to Qualified Immunity.

## **CONCLUSION**

For the reasons set forth above, Defendant New York City Police Officers Stephanie Davis and Brian Hirschman, respectfully request the Court enter an Order, pursuant to Rule 50 of the Federal Rules of Civil Procedure, granting them a judgment as a matter of law based upon Qualified Immunity, on Plaintiff's unlawful search and seizure claim, together with such other and further relief as the Court deems just and proper.

We thank the Court for its time and consideration of this matter.

Dated:  New York, NY
     May 14th, 2024

              Respectfully Submitted


              _____/s/_____

              BY: Douglas LaBarbera (DL 6212)
              LABARBERA & ASSOCIATES
              *Attorneys for Defendants Davis & Hirschman*
              111 John Street, Suite 640
              New York, NY 10038

CC:  **VIA ECF**

    Andrew Brian Stoll
    Stoll, Glickman & Bellina, LLP
    *Attorneys for Plaintiff*
    300 Cadman Plaza West, 12th Floor
    Brooklyn, NY 11201

    Luca DiFronzo
    Hannah Faddis
    New York City Law Department
    Special Federal Litigation Division
    100 Church Street
    Ste 3-216
    New York, NY 10007