```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| SHAWN STEWART,<br><br>    Plaintiff,<br><br>-v-<br><br>STEPHANIE DAVIS and BRIAN HIRSCHMAN,<br><br>    Defendants. | 22-cv-3583 (JSR)<br><br>MEMORANDUM ORDER |

JED S. RAKOFF, U.S.D.J.:

A jury unanimously found defendants, former New York City police officers Stephanie Davis and Brian Hirschman, liable under 42 U.S.C. § 1983 for unlawfully detaining plaintiff Shawn Stewart without reasonable suspicion, and awarded Stewart $25,000 in damages. Defendants now seek to vacate the verdict under Federal Rule of Civil Procedure 50 and obtain a judgment of qualified immunity as a matter of law. Although the Court is not without considerable sympathy for Officers Davis and Hirschman given Stewart's arguably evasive response to their inquiries, the Court finds that it is nevertheless obliged to deny their motion.

I.   Factual and Procedural Background

The following facts come from the trial record, including defendants' body camera footage of the entire incident in question. As the parties agree is appropriate for this post-trial motion, in assessing the facts the Court must draw all reasonable inferences in favor of Stewart, who prevailed at trial. See Jones v. Treubig,

1

963 F.3d 214, 219, 223-24 (2d Cir. 2020) (explaining, "in the context of a" Rule 50 motion for qualified immunity, that the Court "must consider the evidence in the light most favorable to the party against whom the motion was made . . . and give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence").[1] In addition, where the body camera footage resolves a factual dispute between the parties or differs from the parties' assertions, the Court relies on the unequivocal camera footage rather than contrary testimony. See Scott v. Harris, 550 U.S. 372, 378-81 (2007).[2]

On September 25, 2019, defendants were police partners on patrol in the Bronx neighborhood of Co-op City. At approximately 11:40am that morning, defendants received a radio call from dispatch asking for nearby officers to respond to a domestic

---

[1] Here and elsewhere, internal alterations, citations, and quotation marks are omitted unless otherwise indicated.

[2] "The Second Circuit has set forth the procedure by which district courts should resolve disputes on factual issues at trial that are relevant to the qualified immunity analysis." Jones, 963 F.3d at 224-25. "In particular, if there are unresolved factual issues which prevent an early disposition of the defense of qualified immunity, the jury should decide these issues on special interrogatories." Id. at 225. Here, however, even when asked by the Court, defendants never presented any such special interrogatories. And defendants themselves argue in their memorandum of law in support of qualified immunity that the Court "must consider the evidence in the light most favorable to" Stewart and give Stewart "the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." ECF No. 72, at 10 (quoting Jones, 963 F.3d at 224).

assault that had allegedly occurred in Apartment 16-G of a building located at 140 Asch Loop. Responding to the call, defendants drove to what they believed was the correct building -- but was in fact 140 Alcott Street, a different building in the same neighborhood.

Arriving at 140 Alcott Street, the only thing that defendants knew about the suspect of the alleged domestic assault was that he was male. In the twenty minutes that elapsed between receiving the call from dispatch and entering 140 Alcott, defendants made no attempt to obtain a name or description of the suspect, such as by calling or radioing dispatch or reaching out to the precinct.[3]

Around noon, defendants entered 140 Alcott and took an elevator up to the 16th floor. When the elevator doors opened, defendants saw Shawn Stewart, who is male, standing by the elevator call button. Stewart was professionally dressed in a button-up shirt and slacks.[4] Defendants immediately asked Stewart where he was coming from. "An apartment," he responded, pointing to his left, in the direction of Apartments 16-A though 16-F. In

---

[3] Although, ordinarily, defendants would have been able to access a description of the suspect from a tablet in their patrol vehicle, both defendants testified that their tablet was not working that day. However, as plaintiff's counsel elicited on cross-examination, neither defendant logged any report of a malfunctioning tablet.

[4] At the time, Stewart was an assistant manager at Rising Ground, an organization that assisted those with developmental challenges or disabilities who resided in the building. Rising Ground had an office on the 16th floor of the building.

3

defendants' body camera footage of this interaction, a sign is visible behind Stewart on the wall, showing that Apartment 16-G -- the place where defendants believed the alleged domestic assault had occurred -- was in the opposite direction of where Stewart indicated he had come from.

Defendants then told Stewart to hand over his identification, but he declined to do so. Defendants then informed him that they were responding to "a dispute" and again inquired where Stewart was coming from. In response, Stewart asked why providing his identification was necessary and whether he was a suspect. Defendants told Stewart they needed to ensure he was not "fleeing" from the dispute in question. "Do I fit the description?", he asked. Officer Davis responded, in a sharp tone, "Do you want us to handcuff you? We asked you a simple question." Rather than provide more information about his whereabouts or hand over his identification, Stewart said "sure, go ahead," before turning around and placing his arms in a position to be cuffed.[5] Officer Davis said, "Fine, cuff him up," and Officer Hirschman did so. All agree that, at this point, Stewart was detained.

Defendants continued to ask Stewart what apartment he was coming from. Stewart, for his part, continued not to verbally

---

[5] There was some suggestion in the record that Stewart, who has a degree from John Jay College of Criminal Justice, was already envisioning a lawsuit, but this is irrelevant to the instant motion. See Trial Tr. 28, 66-67.

4

answer their question but, instead, to ask why he was handcuffed and whether he was a suspect or matched a description of a suspect. Officer Davis replied, "All you had to do was tell us where you were coming from." Roughly nine minutes into the encounter, Officer Hirschman told Stewart, "You're being forcibly stopped." Eleven minutes or so after Stewart was placed into handcuffs, two other officers arrived. Officer Davis explained to one of those officers, out of earshot of Stewart, "He wouldn't tell us where he was coming from . . . . I don't think it's him." Two minutes later, Stewart's employer -- a man known to Officer Davis as someone who worked in the building -- arrived from the direction of Apartments 16-A through 16-F, the same direction Stewart had briefly pointed to when initially asked where he was coming from.

Shortly thereafter, Officer Davis answered a call from a police lieutenant, one of her superiors. Officer Davis told the lieutenant,

> "This guy was giving us a hard time so we had to forcibly . . . stop him. He refused to tell us where he was coming from and he's just challenging us and everything. He doesn't seem to be part of the dispute now that we have more information. But he is just on a rampage now. . . . We kept asking his name and where he was coming from but he did not want to give it to us. He was trying to flee in the elevator . . . ."

Even after Officer Davis told her lieutenant over the phone that she did not believe Stewart was a suspect in the dispute, defendants kept Stewart detained in handcuffs. When the lieutenant

5

eventually arrived, Stewart had been handcuffed for more than twenty minutes. At that point, none of the officers on the scene had managed to contact the complainant of the reported dispute.[6] The lieutenant, with whom Stewart was more cooperative, confirmed with Stewart that he worked, but did not reside, in the building. Stewart asked the lieutenant whether he was legally required to provide his identification when asked, even if he was not a suspect of any crime. The lieutenant responded, "No," and instructed defendants to uncuff Stewart. While holding Stewart's identification and referencing an apparently now-available description of the suspect, the lieutenant said to Officer Davis, "That's not his name. He doesn't even fit the description." The lieutenant then arranged for defendants to provide their names and badge numbers to Stewart, and Stewart's employer told him to take the rest of the day off.

On May 3, 2022, Stewart sued Officers Davis and Hirschman under 42 U.S.C. § 1983 for unlawful detention and excessive force (the latter claim relating mostly to Stewart's contention that the handcuffs were too tight). The case was initially assigned to Judge Torres. After defendants filed a third-party complaint against the City of New York seeking indemnification if they were found liable,

---

[6] The officers were all unaware that they were in the wrong building.

discovery proceeded, followed by months of mediation. After the mediation failed, the case became ready for trial, for which purpose it was transferred to the undersigned.

On April 8, 2024, the Court began a four-day jury trial on Stewart's claims.[7] At the close of Stewart's evidence, and again at the close of all evidence, defendants moved under Federal Rule of Civil Procedure 50 for judgment as a matter of law, which the Court denied from the bench. On April 11, 2024, the jury unanimously found defendants not liable for excessive force but liable for unlawful detention, awarding $25,000 in damages. ECF No. 61. On May 14, 2024, defendants again moved for judgment as a matter of law under Rule 50, this time contending that they are entitled to qualified immunity. ECF No. 72 ("Mem."). Stewart filed an opposition on May 28, 2024, ECF No. 73 ("Opp."), and defendants replied on June 4, 2024, ECF No. 74 ("Reply").

II. <u>Legal Background</u>

"Police officers are shielded from suit under § 1983 so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

---

[7] At the request of all parties, the Court bifurcated the third-party indemnification claim, ruling that it would decide the indemnification issue as a matter of law if the jury found defendants liable for any of Stewart's claims.

known."[8] Dancy v. McGinley, 843 F.3d 93, 106 (2d Cir. 2016). "A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. The corollary proposition is that "if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context, the officer is entitled to qualified immunity." Id. "But, if it is obvious that no reasonably competent officer would have taken such action, that officer will not be immune." Id.

The parties have agreed throughout this litigation that defendants' detention of Stewart was unlawful if it was not supported by "reasonable suspicion -- a reasonable basis to think that the person to be detained is committing or has committed a criminal offense." Id. "Reasonable suspicion requires more than an

---

[8] "Qualified immunity is an immunity from suit rather than a mere defense to liability." Pearson v. Callahan, 555 U.S. 223, 237 (2009). Because such immunity is "effectively lost if a case is erroneously permitted to go to trial," the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Id. at 232. But here, defendants did not move for qualified immunity -- indeed, they made no motions whatsoever -- until the close of the evidence at trial. Although there might be a lurking argument that defendants have forfeited any entitlement to qualified immunity, see Maye v. City of New Haven, 89 F.4th 403, 407 (2d Cir. 2023) ("[Q]ualified immunity . . . is an affirmative defense that can be waived."), the Court need not address that possibility because Stewart does not raise it.

inchoate suspicion or mere hunch." Id. "It demands specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting legal wrongdoing." Id. Assessing reasonable suspicion requires "tak[ing] into account the totality of the circumstances supporting the investigatory stop, and evaluat[ing] those circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." Id.

With its verdict, the jury has already determined that such reasonable suspicion was lacking. The relevant question for qualified immunity, however, is whether -- at the time the detention occurred, based on the facts then available -- the presence or absence of reasonable suspicion was "arguable" under applicable law. Cf. Figueroa v. Mazza, 825 F.3d 89, 100 (2d Cir. 2016) ("In the context of § 1983 actions predicated on allegations of false arrest, we have held that an arresting officer is entitled to qualified immunity so long as 'arguable probable cause' was present when the arrest was made.").[9]

---

[9] In Figueroa, the Second Circuit looked for "arguable probable cause" rather than "arguable reasonable suspicion" because the plaintiff had been subject to a full-blown arrest. Id. Here, Stewart never argued that his detention amounted to an arrest as opposed to a mere stop, and thus he advanced the more permissive reasonable suspicion as the governing standard.

9

"A police officer has arguable [reasonable suspicion] if either (a) it was objectively reasonable for the officer to believe that [reasonable suspicion] existed, or (b) officers of reasonable competence could disagree on whether the [reasonable suspicion] test was met." Id. "Put another way, an arresting officer will find protection under the defense of qualified immunity unless no reasonably competent officer could have concluded, based on the facts known at the time of arrest, that [reasonable suspicion] existed." Id.

III. Analysis

Qualified immunity provides no recourse for defendants because, when they detained Stewart on September 25, 2019, no competent officer could have concluded that there was reasonable suspicion to do so. In arguing to the contrary, defendants point to the following facts:

> When the Officers were responding to the 911 call, they knew they were addressing a dispute that happened in a specific apartment, 16-G, on the 16th floor. They also knew they were looking for a male perpetrator. When they arrived at the 16th floor, they observed Plaintiff, a male, attempting to get on the elevator to leave the location. The Officers reasonably believed Plaintiff might be fleeing from the location of the dispute.

Mem. at 14.

Defendants add that their suspicion was "heightened" when Stewart told them "he was coming from an apartment," because "the Officers knew from the 911 call that the dispute they were

10

addressing happened in an apartment." Id. In addition, Stewart "refused to answer" the question of what specific apartment he was coming from and instead "demanded to be told details about what the Officers were investigating" and "whether he fit the description of a suspect." Id. at 15. In defendants' view, because Stewart "failed to provide even the most basic information after he stated he was coming from an apartment, . . . it [was] reasonable for the Officers to believe he was acting in a manner inconsistent with innocence." Id. at 15-16. To sum up the above points, defendants contend that a reasonably competent officer could have determined there was reasonable suspicion to stop Stewart because he was a man waiting for the elevator on the floor of concern and he asked questions of his own rather than cooperate with their investigation.

In evaluating whether defendants' position is "arguable," Figueroa, 825 F.3d at 100, the Court is mindful "that the concept of reasonable suspicion is somewhat abstract." United States v. Arvizu, 534 U.S. 266, 274 (2002). Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person," and courts "must give due weight" to such inferences. Id. at 273. Even if each fact "alone is susceptible of innocent explanation," the available facts, when "[t]aken together," may "suffice[] to form a particularized and

11

objective basis" for a police stop. Id. at 277. Because the significance of a particular fact is often contextual, the cases discussing and applying reasonable suspicion do not divide into "a neat set of legal rules." Id. at 274.

But the fact that the "legal rules" governing reasonable suspicion are not "neat" does not mean they are nonexistent or any less binding. Id.; see Ornelas v. United States, 517 U.S. 690, 697 (1996) ("[T]he legal rules for probable cause and reasonable suspicion acquire content . . . through application."). Indeed, the Supreme Court has held that appellate courts review district court determinations of reasonable suspicion de novo, rather than deferentially, precisely so that "appellate courts [can] clarify the legal principles." Arvizu, 534 U.S. at 275. As the Supreme Court explained, "de novo review tends to unify precedent and will come closer to providing law enforcement officers with a defined set of rules which, in most instances, makes it possible to reach a correct determination beforehand as to whether an invasion of privacy is justified in the interest of law enforcement." Ornelas, 517 U.S. at 697-98.

Turning to the rules, elucidated by appellate precedent, that are relevant here, it becomes clear that the combination of facts known to defendants at the time they stopped Stewart is not the stuff of which reasonable suspicion is made. For one, the mere fact that Stewart is male could hardly have raised a reasonable

12

eyebrow. The Second Circuit has explained that even a description of a suspect as "thin, black, and male" is "too vague . . . to justify a stop of anyone meeting it." <u>Dancy</u>, 843 F.3d at 109. Indeed, "a description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure." <u>Brown v. City of Oneonta</u>, 221 F.3d 329, 334 (2d Cir. 2000). Here, because defendants were without a description of the suspect before entering the building in question, the officers did not even know the suspect's race. The only identifying information they had was his gender, which is plainly insufficient for any sort of suspicion.

Nor do other facts supply the missing link. Defendants emphasize that Stewart was coming from an apartment, which they contend was significant because the alleged domestic assault to which they were responding also happened in an apartment. But there were at least twelve apartments on the 16th floor of this apartment building. And virtually *anyone* present in or exiting the building, whether from the 16th floor or otherwise, would have been coming from an apartment. Cf. <u>Dancy</u>, 843 F.3d at 109 ("Under the circumstances, the description fit too many people to constitute sufficient articulable facts on which to justify a forcible stop."). Moreover, when defendants first asked Stewart where he was coming from, he pointed (albeit briefly) in the *opposite* direction of Apartment 16-G (where defendants believed the alleged

13

domestic assault occurred). Further still, the trial record contains no indicia that Stewart was in flight. As the body camera footage makes plain, Stewart neither "appeared nervous, attempted to conceal anything, changed direction, ran away, quickened [his] pace, [n]or made furtive gestures." Dancy, 843 F.3d at 110.

What that leaves is Stewart's steadfast refusal to provide his identification or provide verbal detail about where he was coming from. Indeed, rather than answer defendants' questions, Stewart asked questions of his own. While this might have appeared evasive to the officers, one of the few bright-line rules in this area, repeatedly emphasized by the Supreme Court and Second Circuit, is that a person's refusal to cooperate with law enforcement cannot *on its own* provide reasonable suspicion. See, e.g., Illinois v. Wardlow, 528 U.S. 119, 125 (2000); United States v. Freeman, 735 F.3d 92, 102 (2d Cir. 2013). "When an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." Id. "And any refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." Id. Although "such refusals when viewed in light of the circumstances, can serve to reinforce the police's reasonable suspicion to stop the individual on the grounds he may be engaged in criminal activity," they cannot "create such suspicion where it does not otherwise validly exist."

14

Id. (emphasis added). Defendants' arguments run headlong into this principle.

Defendants insist that Stewart should have cooperated with them so they could "rule him out as a suspect." Mem. at 8. That argument fundamentally misapprehends what reasonable suspicion means. By defendants' lights, an officer can simply presume suspicion against someone -- and if the recipient of that suspicion fails to cooperate with the officer to rule himself out, that failure is itself sufficient reason to detain the person. That gets the law backwards. Even if it may have been prudent to cooperate, Stewart had no legal obligation to explain his whereabouts to defendants. And because nothing else about these factual circumstances remotely furnished articulable and particularized reason to suspect Stewart had committed a crime, his refusal to cooperate was not justification to detain him.

Defendants alternatively argue that, even if they lacked reasonable suspicion to detain Stewart, Stewart consented to the detention by responding, "sure, go ahead," when asked if he preferred to be handcuffed rather than turn over his identification. This argument was made to the jury, but the jury rejected this defense at trial when it found defendants liable for unlawful detention. Defendants now contend that this defense was at least "arguable," and therefore entitles them to qualified immunity. Mem. at 16. But, as the body camera footage (which

15

includes sound) clearly shows, the "question" that the officers put to Stewart about whether he wanted to be handcuffed was made in a tone indicating it was more a threat than a question. Indeed, as Officer Davis herself testified, defendants' question to Stewart about whether he wanted to be handcuffed was no mere request but "an ultimatum." Trial Tr. 159. And "[c]itizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse." Florida v. Bostick, 501 U.S. 429, 438 (1991). It would have been plain to any officer of reasonable competence that Stewart was given a binary choice -- to either hand over his identification and cooperate with the officers, or be put in handcuffs. Because "'[c]onsent' that is the product of official intimidation or harassment is not consent at all," id., this argument, too, fails.[10]

IV. Conclusion

The Court denies defendants' motion for qualified immunity because no reasonable police officer could have believed that there was reasonable suspicion to detain Stewart. The Clerk is

---

[10] Stewart also argued at trial that, even if defendants had reasonable suspicion for the initial stop, his detention was nevertheless unlawful because it was unreasonable in length. But because a reasonable jury could have found defendants liable based on a lack of reasonable suspicion for the initial stop -- and such lack of reasonable suspicion is based on clearly established law, not arguable -- the Court need not reach whether defendants would be entitled to qualified immunity for this alternate theory of liability.

respectfully directed to close document 70 on the docket of this case. The parties are directed to jointly call chambers, within one week of the issuance of this Opinion and Order, to set a briefing schedule for the third-party indemnification claim.

SO ORDERED.

New York, NY
June 21, 2024

JED S. RAKOFF, U.S.D.J